## EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



FILED
IN CLERKS OFFICE

2003 DEC 19  A 10: 33

U.S. DISTRICT COURT
DISTRICT OF MASS.

---

DAVID DEITZEL
42 Carter Street
Leominster, MA 01453

      Plaintiff,

v.

SPRINGFIELD TERMINAL RAILWAY
COMPANY
Iron Horse Park
North Billerica, MA 01862
c/o CT Corporation System
101 Federal Street, Boston, MA 02110
      and

GUILFORD RAIL SYSTEMS
Iron Horse Park
North Billercia, MA 01862

      Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.

03 - 1 2 5 6 0 RGS

MAGISTRATE JUDGE Collings

## COMPLAINT

COMES NOW the plaintiff, David Deitzel, by and through the undersigned counsel, Mario Bozza, Esquire and  Steven M. Lafferty, Esquire, and claims of the defendants, Springfield Terminal Railway and Guilford Rail Systems, an amount in excess of the statutory arbitration limits, and avers the following:

1.    Plaintiff, David Deitzel, is an adult individual residing in Leominster, Massachusetts.

2.    Defendant, Springfield Terminal Railway Company ("Springfield"), is a corporate entity duly organized and existing under any by virtue of laws of the Commonwealth of Massachusetts and, at all times material hereto,

was engaged in owning and operating a line and system of railroads and railroad properties as a common carrier of goods and passengers for hire in interstate commerce and transportation in, through and between various and several states of the United States, and doing business and having a principal place of business in Billerica, Massachusetts.

3. Defendant, Guilford Rail Systems, ("Guilford") is a corporate entity duly organized and existing under any by virtue of laws and, at all times material hereto, was engaged in owning and operating a line and system of railroads and railroad properties as a common carrier of goods and passengers for hire in interstate commerce and transportation in, through and between various and several states of the United States, and doing business and having a principal place of business in Billerica, Massachusetts.

4. At all times material hereto and for some time prior thereto, plaintiff was employed by defendants, Springfield and/or Guilford as a conductor in their business of interstate commerce and transportation by railroad.

5. Upon information and belief and at all times relevant hereto, defendant, Guilford Rail Systems owned, operated, controlled and/or was responsible for defendant, Springfield Terminal Railway.

6. This action is brought pursuant to the Federal Employers' Liability Act, 45 U.S.C S. §§51, et seq. (1908), and the Federal Safety Appliance Act, 49 U.S.C.S. §§1, et seq. and Locomotive Boiler Act, 49 U.S.C.S. §§ 20701 et seq.

7. On or about March 12, 2001, while acting in the course and scope of his employment with defendants' Springfield and/or Guilford, plaintiff was ·injured while attempting to throw a switch in defendant's Nashua, New Hampshire Yard in Nashua New Hampshire.

2

8.    Plaintiff was injured because the aforesaid switch malfunctioned, was defective and was improperly and/or poorly maintained.

9.    Plaintiff was injured as a result of the defective and hazardous condition of the switch.

## COUNT I

## David Deitzel v. Springfield Terminal Railway

10.   Plaintiff, David Deitzel, hereby incorporates by reference paragraphs 1 through 9 of the Complaint as if same were fully set forth herein.

11.   As a result of this accident the plaintiff was caused to sustain severe and permanent personal injuries, as more fully set forth below.

12.   Plaintiff's injuries were caused, both directly and proximately, by the negligence, gross negligence, carelessness, recklessness, and/or unlawful conduct of the defendant, Springfield, acting by and through its agents, servants and employees and/or its ostensible agents, servants and employees in the following respects:

(a)   failing to use ordinary care to furnish plaintiff with a reasonably safe place to work and to perform the duties of his employment by failing to provide plaintiff with a work area free of hazards and unsafe conditions;

(b)   failing to use ordinary care to furnish plaintiff with a reasonably safe place to work and to perform the duties of his employment by failing to maintain the subject yard and/or switch in a reasonably safe condition;

(c)   failing to use ordinary care to furnish plaintiff with a reasonably safe place to work and to perform the duties of his employment by requiring plaintiff to perform his assigned job tasks in an area made unsafe due to the presence of a dangerous condition;

3

(d)   failing to warn plaintiff of the unreasonably dangerous conditions and/or hazardous condition of the work area, including but not limited to the subject yard and/or switch, which were made unsafe due to the presence of a dangerous condition;

(e)   failing to provide plaintiff with safe equipment, free of hazards and defects;

(f)   failing to properly maintain, inspect and/or repair the subject yard and/or switch, to ensure that same were reasonably safe to use free from defects;

(g)   failing to comply with governmental and/or other applicable safety regulations concerning the safety of the work area   particularly as they pertain to maintaining work areas free from struck switch hazards and/or slippery substances;

(h)   failing to discover, in the exercise of reasonable care, the defective, dangerous and/or hazardous condition involving the subject yard and/or switch, as more fully described above;

(i)   failing to remedy and/or correct the defective, dangerous and/or hazardous conditions of the work area, particularly the dangerous condition of the subject switch, as described above; and

(j)   failing to provide proper and safe equipment and/or tools for plaintiff to properly and safely perform his job duties.

13.   As a direct and proximate result of the negligence, carelessness, recklessness and/or unlawful conduct of the defendant, as more fully set forth above, plaintiff was caused to suffer severe and permanent injuries, severe shock to his nerves and nervous system, aggravation, acceleration and activation of any and all pre-existing ailments and/or conditions, and more particularly, but not in limitation of any other personal injuries he may have sustained, plaintiff suffered injuries to his left arm and neck, and

4

back by reason of which he has suffered great physical pain and mental distress which he yet suffers and will continue to suffer into the future.

14.   As a direct and proximate result of the negligence, carelessness, recklessness and/or unlawful conduct of the defendant Springfield, as more fully set forth above, plaintiff was obliged to expend significant sums of money for medical treatment and will be required to expend considerable amounts of money into the future for medical care in order to effect and cure and/or a diminution of her injuries.

15.   As a direct and proximate result of the negligence, carelessness, recklessness and/or unlawful conduct of the defendant Springfield, as more fully set forth above, plaintiff has suffered in the past and will continue to suffer into the future significant pain, mental anguish, humiliation and disfigurement and the limitation and restriction of his usual activities, pursuits and pleasures.

16.   As a direct and proximate result of the negligence, carelessness, recklessness and/or unlawful conduct of the defendant Springfield, as more fully set forth above, plaintiff has suffered in the past and will continue to suffer into the future a loss of earnings and earning capacity as well as additional financial expenses or losses.

17.   The injuries sustained by plaintiff were caused solely and proximately by the negligence of the defendant Springfield, its agents, servants and employees and/or its ostensible agents, servants and/or employees and were in no way caused by any act or omission on the part of the plaintiff.

WHEREFORE, plaintiff, David Deitzel demands judgment in his favor and against defendant, Springfield, in an amount in excess of the statutory arbitration limits as compensatory damages together with costs, interest and any further and additional relief that this Honorable Court deems appropriate.

5

## COUNT II

### David Deitzel v. Guilford Rail Systems

18.    Plaintiff, David Deitzel, hereby incorporates by reference paragraphs 1 through 18 of the Complaint as if same were fully set forth herein.

19.    As a result of this accident the plaintiff was caused to sustain severe and permanent personal injuries, as more fully set forth below.

20.    Plaintiff's injuries were caused, both directly and proximately, by the negligence, gross negligence, carelessness, recklessness, and/or unlawful conduct of the defendant Guilford, acting by and through its agents, servants and employees and/or its ostensible agents, servants and employees in the following respects:

(a)    failing to use ordinary care to furnish plaintiff with a reasonably safe place to work and to perform the duties of his employment by failing to provide plaintiff with a work area free of hazards and unsafe conditions;

(b)    failing to use ordinary care to furnish plaintiff with a reasonably safe place to work and to perform the duties of his employment by failing to maintain the subject yard and/or ballast in a reasonably safe condition;

(c )    failing to use ordinary care to furnish plaintiff with a reasonably safe place to work and to perform the duties of his employment by requiring plaintiff to perform his assigned job tasks in an area made unsafe due to the presence of a dangerous condition;

(d)    failing to warn plaintiff of the unreasonably dangerous conditions and/or hazardous condition of the work area, including but not limited to the

6

subject yard and/or switch, which were made unsafe due to the presence of a dangerous condition;

(e)     failing to provide plaintiff with safe equipment, free of hazards and defects;

(f)     failing to properly maintain, inspect and/or repair the subject yard and/or switch, to ensure that same were reasonably safe to use free from defects;

(g)     failing to comply with governmental and/or other applicable safety regulations concerning the safety of the work area particularly as they pertain to maintaining work areas free from struck switch hazards and/or slippery substances;

(h)     failing to discover, in the exercise of reasonable care, the defective, dangerous and/or hazardous condition involving the subject yard and/or switch, as more fully described above;

(i)     failing to remedy and/or correct the defective, dangerous and/or hazardous conditions of the work area, particularly the dangerous condition of the subject switch, as described above; and

(j)     failing to provide proper and safe equipment and/or tools for plaintiff to properly and safely perform his job duties.

21.     As a direct and proximate result of the negligence, carelessness, recklessness and/or unlawful conduct of the defendant, Guilford, as more fully set forth above, plaintiff was caused to suffer severe and permanent injuries, severe shock to his nerves and nervous system, aggravation, acceleration and activation of any and all pre-existing ailments and/or conditions, and more particularly, but not in limitation of any other personal injuries he may have sustained, plaintiff suffered injuries to his left arm and neck, and back by reason of which he has suffered great physical

7

pain and mental distress which he yet suffers and will continue to suffer into the future.

22.   As a direct and proximate result of the negligence, carelessness, recklessness and/or unlawful conduct of the defendant, as more fully set forth above, plaintiff was obliged to expend significant sums of money for medical treatment and will be required to expend considerable amounts of money into the future for medical care in order to effect and cure and/or a diminution of his injuries.

23.   As a direct and proximate result of the negligence, carelessness, recklessness and/or unlawful conduct of the defendant, Guilford, as more fully set forth above, plaintiff has suffered in the past and will continue to suffer into the future significant pain, mental anguish, humiliation and disfigurement and the limitation and restriction of his usual activities, pursuits and pleasures.

24.   As a direct and proximate result of the negligence, carelessness, recklessness and/or unlawful conduct of the defendant, Guilford, as more fully set forth above, plaintiff has suffered in the past and will continue to suffer into the future a loss of earnings and earning capacity as well as additional financial expenses or losses.

25.   The injuries sustained by plaintiff were caused solely and proximately by the negligence of the defendant, Guilford, its agents, servants and employees and/or its ostensible agents, servants and/or employees and were in no way caused by any act or omission on the part of the plaintiff.

WHEREFORE, plaintiff, David Deitzel demands judgment in his favor and against defendant Guildford in an amount in excess of the statutory arbitration limits as compensatory damages together with costs, interest and any further and additional relief that this Honorable Court deems appropriate.

8

A jury trial is demanded.

Dated:  12-17-03

By: _____
Mario Bozza, Esq.
BBO: 052860
63 Commercial Wharf
Boston, MA 02110

Of Counsel:

By: _____
Steven M. Lafferty, Esq.
BARISH LAW OFFICES, P.C.
1601 Cherry Street
Three Parkway – 13th Floor
Philadelphia, PA 19102

9

**EXHIBIT B**

ORIGINAL

Volume:   I

Pages:   1-179

Exhibits:   One

UNITED STATES OF AMERICA

DISTRICT OF MASSACHUSETTS

C.A. No.   03-12560-RGS

*******************************

| | |
|---|---|
| DAVID DEITZEL, | * |
| Plaintiff, | * |
| v. | * |
| SPRINGFIELD TERMINAL RAILWAY | * |
| COMPANY, | * |
| Defendant. | * |

*******************************

DEPOSITION of DAVID DEITZEL, a witness
called on behalf of the Defendant,
pursuant to the applicable provisions of the
Massachusetts Rules of Federal Procedure,
before CATHERINE L. ZELINSKI, a Certified
Shorthand Reporter and Notary Public, in and
for the Commonwealth of Massachusetts, at the
Law Offices of O'Brien and von Rosenvinge,
PC, 27 Mica Lane, Wellesley, Massachusetts,
on Wednesday, February 23, 2005, commencing
at 10:20 a.m.

G & M COURT REPORTERS & ASSOCIATES

(617) 338-0030

| | | |
|---|---|---|
| 1 | Q. | He was the engineer on the Ayer spare list? |
| 2 | A. | I don't, I don't know which -- I don't |
| 3 | | remember the circumstances in that, you know, |
| 4 | | the day, date, that I worked with him, but it |
| 5 | | was around 1988. It was in the beginning of |
| 6 | | my career. I believe I worked with him in |
| 7 | | Lowell. I believe he was a regular engineer |
| 8 | | on a job in Lowell at the time. |
| 9 | Q. | So in '88 were you working with him every |
| 10 | | day, PJ Collins? |
| 11 | A. | No, I was on the spare list so I -- I think |
| 12 | | I worked with him just that day. |
| 13 | Q. | The day of this incident? |
| 14 | A. | Oh, in '88 you mean? |
| 15 | Q. | Let me ask you. Strike it out. |
| 16 | | You first worked with him, your best |
| 17 | | memory is you first worked with PJ Collins in |
| 18 | | 1988? |
| 19 | A. | Yes. |
| 20 | Q. | You were working with him on the date of the |
| 21 | | incident in this case? |
| 22 | A. | Correct. |
| 23 | Q. | And the date of incident in this case is |
| 24 | | what? |

| | | |
|---|---|---|
| 1 | A. | March 14th.  I believe it was March 14, |
| 2 | | 2001. |
| 3 | Q. | Are you sure of that? |
| 4 | A. | I get that date wrong.  I'd have to look in |
| 5 | | my time book to see the exact day date. |
| 6 | Q. | So your answer to my question is:  No, you're |
| 7 | | not sure? |
| 8 | A. | No, I'm not sure.  Yeah, I believe it was |
| 9 | | March 14, 2001. |
| 10 | Q. | Whatever the date was you were working with |
| 11 | | PJ Collins on that day? |
| 12 | A. | Yes, I was. |
| 13 | Q. | Now, the day before your accident or the day |
| 14 | | before the incident involved in this lawsuit |
| 15 | | you were working with PJ Collins? |
| 16 | A. | The day before? |
| 17 | Q. | Yes. |
| 18 | A. | No, I wasn't. |
| 19 | Q. | When did you last work with PJ Collins before |
| 20 | | the day of the incident involved in this |
| 21 | | lawsuit? |
| 22 | A. | I don't remember. |
| 23 | Q. | Well, was it, do you know if you worked with |
| 24 | | him in March of 2001 -- |

1      We were preparing to go on track one to get

2      some cars to switch to service, the

3      consignee. Which consignee that was, I don't

4      remember.

5  Q.  Now, in that answer did you, could you just

6      describe for the jury your job duties and

7      responsibilities on the day of the incident

8      in the Nashua yard?

9  A.  Conductor in A1.

10 Q.  I know what that means and you obviously know

11     what that means and maybe some of the people

12     in the jury know what it means, but the

13     likelihood, few, if any, are going to know.

14     Can you elaborate at all?

15 A.  Yes, a conductor is responsible for

16     conducting all business: Movements of the

17     train, signals, throwing switch, picking up

18     cars, setting off cars, car numbers,

19     dangerous positions, etcetera.

20 Q.  Now, you mentioned switch. Part of your job

21     duties and responsibilities were, involved

22     switch?

23 A.  Yes, throwing switch, correct.

24 Q.  Say again?

1    A.    Throwing switch, correct.

2    Q.    Is that it with respect to your job duties

3          and responsibilities was -- did those duties

4          and responsibilities include within them

5          anything beyond throwing switches?

6    A.    I don't understand the question.

7    Q.    With respect to your job duties and

8          responsibilities you reference switch?

9    A.    Uh-huh -- oh, yes, I did.

10   Q.    When you used the term, you used the term

11         throwing switch?

12   A.    Yes.

13   Q.    That's the actual physical activity of

14         throwing a switch, is that what you meant by

15         throwing switch?

16   A.    Moving switches would be a better word.

17   Q.    And moving switches, that enables cars to go

18         from one track to another?

19   A.    Correct.

20   Q.    And enable the conductor to get the cars in

21         the order he wants to?

22   A.    Yes.

23   Q.    Now, you mentioned it was your first move

24         that day?

| 1 | | engine and it was -- he was looking out the |
|---|---|---|
| 2 | | window at me and he said, What did you do? |
| 3 | | What happened? He said, What did you do? I |
| 4 | | think he said, What did you do pull a muscle? |
| 5 | | You know. And he came down and he said, Are |
| 6 | | you okay? And I said, Yeah, I think I pulled |
| 7 | | a muscle, Phil. Gees, I felt a sharp like |
| 8 | | pain. And he said, Well, go down and sit |
| 9 | | down for a minute. Which we did. And.... |
| 10 | Q. | Let me ask you a question: When he said to |
| 11 | | you go down and sit down for a minute, did |
| 12 | | you go to the yard office? |
| 13 | A. | Yes. |
| 14 | Q. | And which switch was involved in what you |
| 15 | | just described? |
| 16 | A. | Track No. 1 switch. |
| 17 | Q. | Track No. 1 switch. |
| 18 | | How far is that from the office yard? |
| 19 | A. | 25 feet maybe. It's real close. |
| 20 | Q. | Was that the first switch you had thrown that |
| 21 | | morning? |
| 22 | A. | Yes, I believe it was. |
| 23 | Q. | And had you -- |
| 24 | A. | It may have been -- it may have been the |

1       second switch.  We were going from the 105 to

2       track 1.

3    Q. All right.

4    A. But I can't remember if the switch was lined

5       off the 105 or not.  If I -- to throw that

6       switch or not, I can't remember.

7    Q. And the 105 is how far from the office yard?

8    A. It's 25 feet.

9    Q. Same thing?

10   A. Uh-huh.

11   Q. Did you walk from the yard office to switch

12      one?

13   A. Yes, I did.

14   Q. Was the engine resting at switch one when you

15      walked up to the switch or had Mr. Collins

16      brought the engine --

17   A. Yeah, Mr. Collins brought the engine up to

18      the switch.

19   Q. From where?

20   A. From the 105.

21   Q. How long did that take him to do that?

22   A. Five minutes.

23   Q. Were there any cars attached to that or just

24      the engine?

1   Q.  And up until that point in time he hasn't had

2       any conversations with you about that switch,

3       has he?

4   A.  No.

5   Q.  Now, when you get to the switch, you look at

6       the switch, right?

7   A.  Yeah, right.

8   Q.  And you -- you had thrown that switch before,

9       right?

10  A.  Yeah, I'm sure I have.

11  Q.  Can you estimate without guessing how many

12      times you'd thrown that switch?

13  A.  No, I can't.

14  Q.  Would it be 10?

15  A.  No, I can't.  I wouldn't be able to say.

16  Q.  But you can tell us it wasn't your first

17      time?

18  A.  No, it wasn't my first time.

19  Q.  And you considered yourself familiar with

20      that switch by way of being able to operate

21      it in the past?

22  A.  Yes.

23  Q.  Now, when you look at the switch, given the

24      weather conditions, it's snowing out, right?

1  A.  No, it wasn't snowing out that day.  It had

2      snowed prior to that.

3  Q.  Prior.

4          When you say it had snowed prior,

5      well, you were delayed two hours from

6      reporting to work?

7  A.  For snow conditions.  For snow conditions

8      prior to that day.

9  Q.  Well --

10  A.  Well, if I'm correct.

11  Q.  Go ahead.

12  A.  If I'm correct, I believe we had a really

13      bad snowstorm.  Like a two or three foot

14      snowstorm a day or two before that.  And if

15      I'm right, that's the first day that job

16      worked before -- after the snowstorm.

17  Q.  So your memory as you sit here today, when

18      you reported to work at about nine a.m. on

19      the day of this incident, which was two hours

20      after you would normally report for that job

21      because of the weather delay?

22  A.  If there was no weather delay, that job

23      would have gone at -- I'm not sure if that

24      job went six a.m. or seven a.m., but it was

1      delayed two hours due to the weather.

2  Q.  And with respect to the statement that you

3      make, the job was delayed due to the

4      weather --

5  A.  Yes.

6  Q.  -- that wasn't because of weather conditions

7      that existed at the time, but rather weather

8      conditions that had occurred prior?

9  A.  Prior, correct.

10 Q.  So your recollection as you sit here today,

11     is when you appeared for work in the Nashua

12     yard on the day of this incident at nine

13     a.m., the weather was clear?

14 A.  Yeah, it was.

15 Q.  Now, when you get off the engine and you walk

16     up to the switch, just describe for the jury

17     what a switch looks like, what it looks like

18     in the yard?

19 A.  Well, there's several different types of

20     switch especially today.

21 Q.  Let me interrupt.  With respect to switch one

22     on there, track one, have I identified it

23     correctly?

24 A.  Can you say it again?

1    of this incident, you can see the pole,

2    right?

3  A. Uh-huh.

4              MR. DEGEORGE:  Just say yes.

5  A. Yes, I'm sorry.

6  Q. Now, you weren't able to see the switch

7    because it was covered with snow?

8  A. No, that's not correct.

9  Q. All right.  So you were able to see the

10    switch because it was clear?

11 A. Yes.

12 Q. When you looked down at the switch, you made

13    a determination based on your experience

14    working on the railroad that you could throw

15    this switch in the intended fashion?

16 A. Yes.

17 Q. And you position yourself in accordance with

18    your training?

19 A. Uh-huh -- yes.  I'm sorry.

20 Q. And you leaned over and lifted the switch in

21    an attempt to throw it?

22 A. Right.

23 Q. When you did all of that, at least up until

24    that point in time, you made observations and

| | | |
|---|---|---|
| 1 | | you made a determination that you could do |
| 2 | | all of that safely without injury to |
| 3 | | yourself? |
| 4 | A. | Yes, I did. |
| 5 | Q. | And you were wrong? |
| 6 | A. | Yes, I was. |
| 7 | Q. | Now, when you threw the switch, it's your |
| 8 | | testimony that the switch didn't function |
| 9 | | properly? |
| 10 | A. | Correct. |
| 11 | Q. | And the reason the switch didn't function |
| 12 | | properly is because there was ice on the |
| 13 | | switch? |
| 14 | A. | That was my determination. That was my |
| 15 | | thoughts at the time, correct. |
| 16 | Q. | And why, is there something different today? |
| 17 | A. | Well, just basically because of the weather |
| 18 | | conditions, based on snow. It had snowed |
| 19 | | prior to that. There was snow on the tracks. |
| 20 | | Snow, you know. There wasn't anything, you |
| 21 | | know, in the switch to prevent me from |
| 22 | | throwing it. But my thoughts were there had |
| 23 | | to have been ice on it because of the prior |
| 24 | | other conditions, but I didn't see any, no. |

1  Q.  So you didn't see any ice on the switch

2      before you threw it?

3  A.  No.

4  Q.  And you didn't see any ice on it after you

5      threw it?

6  A.  No.

7  Q.  And the switch didn't have any snow on it?

8  A.  All around it.

9  Q.  On it.  It had been cleared?

10            MR. DEGEORGE:  Well, object to the

11     form.

12            MR. O'BRIEN:  Well, that's what I'm

13     asking.

14  Q.  You're mentioning around it and I'm trying to

15     find out about the switch.  Let me ask

16     another question.

17  A.  Yes, please, ask it another way.  I don't

18     understand how you're asking it.

19  Q.  Sure.

20            You were able to locate the switch

21     when you got there?

22  A.  Yes, I could see it.

23  Q.  And you walked over.  You would not have

24     attempted to throw that switch if when you

| | | |
|---|---|---|
| 1 | | looked at it, there had been no indication to |
| 2 | | you at all that there was any attempt to |
| 3 | | clear that switch? |
| 4 | A. | Correct. |
| 5 | Q. | So based on your observations, you made a |
| 6 | | determination that it had been cleared, and |
| 7 | | that it was safe for you to lift it? |
| 8 | A. | Yes. |
| 9 | Q. | Now, you told us about the remarks by |
| 10 | | Mr. Collins immediately after you attempted |
| 11 | | to throw the switch? |
| 12 | A. | Uh-huh -- yes, I did. |
| 13 | Q. | And you described for us what you felt in |
| 14 | | your left arm and your shoulder at the time |
| 15 | | you threw the switch? |
| 16 | A. | Yeah, very sharp pain.  It was almost like |
| 17 | | -- it was just like a jolt.  Like a very |
| 18 | | quick, sharp jolt pain. |
| 19 | Q. | Where? |
| 20 | A. | It started in my shoulder and went right |
| 21 | | down into my arm. |
| 22 | Q. | How far down your arm? |
| 23 | A. | All the way to my fingers. |
| 24 | Q. | Had you ever felt that sensation before the |

1   Q.  Sure.

2          Is it your contention that the

3      railroad failed to remove ice and snow from

4      the switch?

5   A.  My thoughts were that when it happened, yes.

6   Q.  But based on your observations, you didn't

7      see any ice and you didn't see any snow?

8   A.  Yes.

9   Q.  So to the extent you contend you were injured

10     due to snow and ice on the switch, that's

11     conjecture on your part?

12  A.  Yes.

13  Q.  Now, you had never encountered any problems

14     with that switch prior to the day of the

15     incident, had you?

16  A.  No.

17  Q.  Now, following the incident, did any

18     information come to your attention concerning

19     the switch?

20  A.  Following the incident?

21  Q.  After the incident occurred, does any

22     information come to your attention concerning

23     prior problems with that switch?

24  A.  Oh, yes, yes.

**EXHIBIT C**

.

.

.

## UNITED STATES OF AMERICA
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID DEITZEL | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: |
| | ) |
| SPRINGFIELD TERMINAL RAILWAY | ) 03-12560-RGS |
| COMPANY | ) |
| | ) |
| Defendant | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## FIRST SET OF INTERROGATORIES

1.  Current:     David B. Deitzel
                 96 Pearl Street
                 Clinton, MA 01510

    Previous:    42 Carter Street
                 Leominster, MA 01453

                 216 Depot Street
                 Fitchburg, MA 01420

2.      (a)(b)  While throwing Track #1 switch at the Nashua Yard I injured my neck and shoulder. I did not know at the time how extensive the injury was. I thought I pulled a muscle.

        (c)     March 12, 2001; I don't recall the time.

        (d)     I reported the injury to immediate supervisor E.R. Towle and the engineer, P.J. Collins. I filled out an accident report on 3/12/01 and faxed a copy from the Nashua Yard to the crew office in Bellerica. I cannot find my copy.

3.      Threw switch according to the way I was trained.



4.

    (a)   .N/A.

    (b)   Springfield failed to remove the ice/snow from the switch. The presence of the ice/snow prevented me from being able to throw the switch.

5.

    (a)   Switch had been a problem prior to this and had been reported. I received this information from P.J. Collins.

    (b)   I don't recall.

    (c)   At the time I did not know the switch was a problem. I didn't see the ice on the switch prior to my accident.

    (d)   P.J. Collins knew the switch was a problem prior to the accident. (Not ice/snow related).

6.    N/A.

7.    See answer to No. 4(b) and No. 5(a).

8.    See answer to No. 7.

9.    See answer to No. 2(d).

10.    I injured my left shoulder and left arm, resulting in pain in my shoulder and pain down my left arm with numbness and tingling. I have a herniated disc in my neck and impingement in my left shoulder, which I believe are permanent conditions. Also, see attached medical reports, records and bills.

11-12. N/A.

13.

    (a)   See attached medical reports, records and bills.

    (b)   See attached medical reports, records and bills.

14.    (a-d)   N/A.

15.    (a-c)   N/A.

(d)     I missed work off and on from my injuries. These records are in the possession of Springfield. These days totaled approximately 5 months.

(e-f)    N/A.

16.     Health Alliance, Leominster, MA; right abdominal pain, chest pain, poked in left eye with twig. Dr. Robert Babineau, see attached medical records.

17.

(a)     See attached medical reports, records and bills; also, right elbow injury 2003, abdominal injury 2003.

(b)     See attached medical reports, records and bills; also, Dr. Babineau.

(c)     See attached medical reports, records and bills; also, sigmoid diverticulosis, possible hernia-see records of Dr. Babineau.

(d)     See letter of Dr. Babineau.

18.     See answer to No. 2(d), Springfield Railway; also, Dr. Babineau, Dr. Paly.

19.     N/A.

20. (a-f)     See records of Dr. Babineau.

21.     Dr. Robert Babineau and Dr. Sidney Paly; see attached medical reports, records and bills.

22.     N/A.

23. (a-c)     Dr. Robert Babineau, Dr. Sidney Paly will testify as to my medical treatment related to the accident.

(d)     Curriculum vitae to be provided.

(e)     N/A.

(f) See attached medical reports, records and bills.

24. (a-d)        See answers to No. 2(d); all treating physicians, see attached medical reports, records and bills.

25. (a-h)        N/A.

BARISH LAW OFFICES, P.C.

By: 

RUDOLPH V. DE GEORGE, II, ESQUIRE
Attorney for Plaintiff David Deitzel
Three Parkway - Suite 1320
1601 Cherry Street
Philadelphia, PA 19102
(215) 923-8900

# VERIFICATION

I, David Dietzel, hereby state that I am the Plaintiff in the within action, and aver that the facts set forth in my Interrogatory Answers are true and correct to the best of my knowledge, information and belief.

This Verification is made subject to the penalties relating to unsworn falsification to authorities.

By: _____

DAVID DIETZEL

Dated: _1 - 21 - 05_

## **CERTIFICATE OF SERVICE**

A true and correct copy of Plaintiff's Interrogatory Answers and Responses to

Defendant's Request for Production of Documents were served upon the following party via Fax

on January 21, 2005.

John J. O'Brien, Jr., Esquire
O'Brien & Von Rosenvinge, P.C.
27 Mica Lane
Suite 202
Wellesley, MA 02481

BARISH LAW OFFICES, P.C.

By:
RUDOLPH V. DE GEORGE, II, ESQUIRE
Attorney for Plaintiff David Deitzel
Three Parkway- Suite 1320
1601 Cherry Street
Philadelphia, PA 19102
(215) 923-8900

**EXHIBIT D**

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

**Civil Action No.: 03-12560RGS**

|  |  |
|---|---|
| **DAVID DEITZEL** | ) |
| **Plaintiff,** | ) |
| vs. | ) |
| **SPRINGFIELD TERMINAL** | ) |
| **RAILWAY COMPANY** | ) |
| **Defendant.** | ) |

### AFFIDAVIT OF LARRY FERGUSON

I, Larry Ferguson, being first duly sworn upon his oath, deposes and states as follows:

1.    I am presently employed by Springfield Terminal Railway Company in the capacity of Director of Train Operations and held this position on or about March 12, 2001.

2.    My duties and responsibilities include reading and interpreting Train Sheets that contain information relating to the record of movement of trains and track cars in the system, including but not limited to District # 2 in which the Nashua, NH rail yard is located.

3.    I have examined the Record of Movement of Trains and Track Cars train sheets dated March 5, 2001 through and including March 19, 2001. I understand that the plaintiff's alleged incident occurred on March 12, 2001.

4.    Based upon my examination of the above referenced train sheets, at least two trains a day passed over the switch in question the week prior to plaintiff's incident (March 5, 2001 and March 11, 2001) and the week after plaintiff's incident (March 13, 2001 and March 19, 2001). At least one train passed over the switch in question prior to the plaintiff's alleged incident on March 12, 2001. None of the train sheets for the above referenced dates make any mention of the train switch involving the plaintiff's claim except on the train sheet dated March 12, 2001 as referenced in paragraph 5 below.

5.    The entry on the March 12, 2001 train sheet states the following:
    "1224 - NA-1 CNDR [conductor] Deitzel pulled a muscle in back or shoulder
    throughing [sic] switch in Nashua YD S/E Lead Switch to 4 + 3."

6.   Any crew members that encountered a problem of any type and nature with the switch are required and expected to report it to the dispatcher. The dispatcher would then make a notation on the train sheet for that particular day.

7.   I have examined the above referenced Train Sheets and there is no mention of the switch in question on any of the train sheets except March 12, 2001.

8.   Based upon my examination of the above referenced train sheets, the switch in question was in good working order between March 5 and March 19, 2001.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS /ov 7 · 200 DAY OF NOVEMBER 2005.

Larry Ferguson
Director of Train Operations
Springfield Terminal Railway Company
Iron Horse Park
North Billerica, MA 01862